IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BERNARD GRIMM, In His Personal
Capacity and d/b/a The Law Office of
Bernard S Grimm
409 7th Street NW Suite 300
Washington, D.C. 20004

     *Plaintiff*,

          v.

PNC BANK, N.A.
t/a PNC
249 Fifth Avenue,
Pittsburg Pennsylvania 15222

     *Defendant.*

Case No.

## **COMPLAINT**

Plaintiff, Bernard Grimm d/b/a The Law Office of Bernard S Grimm, in addition to Plaintiff Bernard Grimm in his personal capacity (both referenced collectively here as "Plaintiff"), through undersigned counsel, files this Complaint against Defendant PNC Bank, N.A., t/a PNC (hereinafter "PNC"), and in support thereof states the following:

## **PARTIES**

1. Plaintiff Bernard Grimm resides in Mclean, Virginia. At all material times hereto Mr. Grimm maintained a law firm, The Law Office of Bernard S. Grimm, located at 409 7th Street NW, Suite 300, Washington D.C. 20004.

2. Defendant, PNC, is a national banking association organized under the laws of the United States with its principal place of business located in Pennsylvania. PNC Bank is a financial institution within the meaning of 18 U.S.C. § 20 and has branches in Virginia, Maryland, and Washington D.C. PNC's deposits are insured by the Federal Deposit Insurance Corporation.

1

PNC maintains numerous offices within the District of Columbia for the purpose of engaging in banking transactions with personal and commercial customers, and regularly conducts business within the District of Columbia.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount of controversy exceeds the sum of $75,000.

4.    Jurisdiction is also vested in this Court pursuant to 28 U.S.C. § 1331 and 15 U.S.C. 1693m(g), as Plaintiff brings a claim based on violations of The Electronic Fund Transfer Act.

5.    Venue in this Court is proper as most of the unlawful acts occurred within Washington D.C. Moreover, Plaintiff's law firm was located within the District of Columbia.

## SUMMARY OF ACCOUNTS AT ISSUE

6.    At all material times hereto, Plaintiff maintained three bank accounts with PNC, ending in 7628, 3331, and 9144. The account ending in 7628 was Plaintiff's law firm Interest on Lawyer Trust Account ("IOLTA"). The account ending in 3331 was Plaintiff's law firm Operating Account. The account ending in 9144 was Plaintiff's Personal Account.

7.    The D.C. Bar Rules of Professional Conduct Rule 1.15 requires that lawyers keep client funds that are in the lawyer's possession in a trust account maintained separately from the lawyer's law firm or personal property. Such trust funds must be deposited in an approved depository as defined by Rule XI of the Rules Governing the District of Columbia Bar. Trust funds that are a nominal amount or are only held for a short amount of time must be held in compliance with the District of Columbia's Interest on Lawyers Trust Account (DC IOLTA) Program. A District of Columbia IOLTA Account must include the name of the lawyer or

law firm that owns the account and include "DC IOLTA Account" or "IOLTA Account" in the account name.

8.      As of 2010, lawyers in the District of Columbia must participate in the DC IOLTA Program and can only hold funds in financial institutions that have agreed to pay IOLTA account holders the highest interest rate or dividend available at their institution, to charge only allowable reasonable fees, and to follow the District of Columbia Court of Appeals issued rules for IOLTA.

9.      These approved depositories must remit to the DC Bar Foundation the interest from an IOLTA account on at least a quarterly basis. When remitting the interest from an IOLTA account, a financial institution is also required to report to the DC Bar Foundation: the name and address of the lawyer/law firm holding the account, the interest rate on the account, the average monthly balance in the account, the fees and charges for the account, the total interest earned during the reporting period, the total interest remitted, and the total number of DC IOLTA accounts held at the institution.

10.     Under Rule XI of the Rules Governing the District of Columbia Bar, in order for a financial institution to be an approved depository for lawyers' trust accounts, the institution must be insured by the FDIC, and it must sign and file the required form with the Board on Professional Responsibility. On the form filed with the Board of Professional Responsibility, the institution must agree to promptly report to the Office of Disciplinary Counsel every instance in which an instrument is presented against a lawyer or law firm's IOLTA account at a time when the account contained insufficient funds to pay the instrument, regardless of whether the instrument was honored and regardless of any applicable overdraft privileges.

Failure to comply with this rule may result in the removal of the institution from the list of Board on Professional Responsibility approved depositories.

11.     The rationale for all of the foregoing rules and regulations as to IOLTA accounts is that the funds in those accounts do not belong to the named law firm account holder, but instead to the clients whose funds are held in trust in those accounts. The heightened standards for such accounts reflect the duties owed by the banking institution principally to clients who own the funds until earned or disbursed by counsel, as well as to the counsel who holds the funds in trust.

12.     Plaintiff had deposited various sums of money with PNC into the three accounts at issue in this complaint, and he did so under the customary rules and regulations applicable to banking institutions, and in compliance with the special rules as to the IOLTA account at issue in this complaint. Plaintiff has at all times abided by the terms and conditions of the agreements between Plaintiff and PNC.

## SUMMARY OF FRAUD SCHEME AND DEFENDANT'S INVOLVEMENT THEREIN

13.     This is an action arising out a fraud scheme perpetrated by one of Plaintiff's employees against Plaintiff which, in order to be successful, depended on the negligence and recklessness of Defendant in multiple regards related to transactions in the accounts at issue here. Plaintiff's employee engaged in a years-long pattern of suspicious and illegal transactions in the accounts, facilitated by Defendant's knowing disregard of obvious and suspicious circumstances, as well as by Defendant's failure to follow its own procedures and industry norms regarding the accounts and transactions, including, *inter alia*, repeatedly cashing or accepting for deposit without inquiry numerous checks over several years, known to be high-risk, third party checks bearing forged signatures as to both the drawer and

fictitious payee; unauthorized endorsements; and other deficiencies, despite red flags and serious irregularities, as described more fully below, but also including deficient training and supervision of its employees.

14.    At all material and relevant times the employee in question, Katherine Ross (hereafter referred to as "Ross"), worked as an office manager and bookkeeper at Plaintiff's law firm from 2016 to 2020. Ross was an hourly employee and worked in a non-lawyer capacity. Plaintiff paid Ross approximately $500 to $600 a week.  On information and belief, she received no bonus or performance increases.

15.    Plaintiff's law firm employed a few individuals. These employees included Plaintiff, several investigators, two law clerks, and Ross.

16.    Ross' duties at the law firm never included the authority to draw checks from Plaintiff's bank accounts. The only checks she was authorized to cash were specifically limited to her own actual compensation and expenses, and rare instances of obtaining funds on behalf of Plaintiff.

17.    At no time ever during her employment at Plaintiff's law firm did Ross have authority to initiate disbursement of funds from Plaintiff's bank accounts.

18.    Additionally, Plaintiff never gave Ross signature authority over any accounts, including the three accounts at issue here. The only person with signature authority was Plaintiff, and his signature was the only signature on file with Defendant as to these accounts.

19.    PNC requires that checks must be properly completed and signed by the person whose authority is on file.

20.    From 2016-2020, Ross embezzled hundreds of thousands of dollars from Plaintiffs' accounts at issue here. Ross fraudulently created checks payable to herself, misappropriated

and stole said checks, and forged Plaintiff's signature as drawer. Ross cashed the checks at

PNC branches in the District of Columbia, Virginia, and Maryland, and also deposited

checks into her personal bank account at a different banking institution.

21.     Ross wrote checks to herself from each of Plaintiffs' accounts at issue in this Complaint.

She wrote these checks without permission from Plaintiff and she was not owed these

amounts. But for the actions and inactions of Defendant, she would not have been able to do

so.

22.     Ross cashed various checks drawn on these accounts at PNC in which she wrote

"compensation" in the description line of the checks. She also cashed checks payable to

herself that included "cash for Bernard Grimm" in the description line. Ross was not entitled

to any of these funds.

23.     Ross also caused money to be transferred from Plaintiff's IOLTA account at PNC to pay

her personal credit card expenses at a different financial institution. She was not authorized

to do so and was not entitled to use those funds for her personal expenses.

24.     By way of example, on or about October 10, 2019, Ross cashed a check that she wrote to

herself from Plaintiff's Law Firm's IOLTA Account in the amount of $1,975. She wrote this

check without permission and wrote "compensation" in the description line. She cashed it as

the PNC branch located at 601 Pennsylvania Avenue, N.W., Washington, D.C. Ross was not

entitled to those funds.

25.     In October 2019, Ross cashed at least eight other checks in which she wrote

"compensation" in the description line. She was not authorized to do so. Two of these checks

were cashed at a time when Plaintiff was hospitalized from October 21-26, 2019. PNC

honored all nine checks despite the fact that they totaled more than $17,000, were cashed

three to four days apart, were cashed at multiple branches, and were drawn from the law firm's and Plaintiff's three PNC accounts.

26.   The fraudulent "compensation" checks that Ross cashed in October 2019 include checks cashed on or about: October 3, 2019 for $1,975 from account 3331; October 7, 2019 for $1,875 from account 9144; October 10, 2019 for $1,975 from IOLTA account 7628; October 15, 2019 for $1,950 from account 3331; October 17, 2019 for $1,975 from account 3331; October 21, 2019 for $1,950 from account 9144; October 24, 2019 for $1,975 from account 3331; October 28, 2019 for $1,950 from account 9144; and October 31, 2019 for $1,980 from IOLTA account 7628.

27.   On October 10, 2019, Ross cashed the $1,975 check from Plaintiff's IOLTA Account at the PNC branch located at 601 Pennsylvania Avenue, NW, Washington, D.C.

28.   On October 15, 2019, Ross cashed the $1,950 check from Plaintiff's Operating Account at the PNC branch located inside the Giant Food supermarket located at 3521 East-West Highway in Hyattsville, Maryland.

29.   On October 31, 2019, Ross cashed the $1,980 check from Plaintiff's IOLTA account at the PNC branch located at 1331 Pennsylvania Avenue, NW, Washington, DC.

30.   Katherine Ross was wholly unauthorized by Plaintiff to sign Plaintiff's name on any checking instrument or endorse any such fraudulent check or to receive the proceeds of any such fraudulent check.

31.   Not only did Ross cash "compensation" checks for funds that she was not entitled to and did not earn, she also cashed checks payable to herself that included "cash for [Plaintiff]" in the description line.

32.     Not only did Plaintiff lose all of the embezzled funds, he had to pay payroll taxes on some of the funds that Ross stole since she disguised the embezzled funds at legitimate compensation. Moreover, as to IOLTA funds, he had to make whole clients whose funds were stolen in the scheme.

33.     In addition to the above locations, Ross also cashed fraudulent checks at PNC branches located at 833 7th Street NW, Washington, D.C., 1050 Connecticut Avenue NW, Washington, D.C., and 3558 S. Jefferson Street, Falls Church, Virginia.

34.     Ross also deposited fraudulent checks at a second financial institution where she had at least one account in her own name.

35.     In addition to embezzling money by writing fraudulent checks to herself, Ross stole funds from Plaintiff by taking advantage of Defendant's failures and linking Plaintiff's Operating Account to a personal credit card account she held at a third financial institution. Ross opened this credit card account in June 2019. From July 2019 to August 2020, Ross transferred approximately $7,264 from the law firm's Operating Account to pay her personal credit card expenses. This included transfers made after Plaintiff fired Ross on June 26, 2020. Ross was not entitled to these funds and was not authorized to use these funds to pay her personal expenses.

36.     In an interview with law enforcement agents on October 8, 2020, Ross admitted to embezzling funds from Plaintiff and his law firm, and in August 2021, Ross pleaded guilty to one count of bank fraud under 18 U.S.C. § 1344.

37.     Plaintiffs lost hundreds of thousands of dollars due to the fraudulent scheme related to these accounts. In connection with Ross' guilty plea and sentencing, the United States and Ross stipulated that Ross stole at least $320,000 from Plaintiff and his law firm through her

embezzlement scheme. They also stipulated that had the case gone to trial, "the loss amount could have been much higher."

38.     The Statement of Offense also noted "the surprising ease with which [PNC] allowed [Ross] to continue to cash checks made payable to herself from [Plaintiff's] accounts despite her criminal behavior."

39.     Documenting the full extent of Plaintiffs' losses will require discovery from Defendant, but at least a total of $725,000 was taken from the accounts through the various methods used by Ross, none of which would have succeeded but for Defendant's failures described herein. PNC violated basic obligations as a depositary by failing to observe its own procedures, customary banking practices, and regulatory requirements. PNC had a duty as a depositary to protect bank customers such as Plaintiff and to combat fraud.

40.     All of the checks that PNC accepted for cashing and/or deposit were: high-risk checks, payable to a person other than the account holder named; drawn to a payee whose name did not match the account holder named; and required manager approval prior to being cashed or accepted for deposit.

41.     Plaintiff first discovered there was a fraudulent check scheme in his accounts in April 2020 and immediately contacted law enforcement and notified Defendant. Plaintiff discovered additional details about the scheme and continued to notify Defendant of the scheme, and of Defendant's knowing disregard of suspicious circumstances, including but not limited to a detailed discussion of the scheme in late June 2020 with Defendant employee Rachel M. (whose last name is unknown to counsel) from PNC Executive Account Services.

42.     Plaintiff gave notice to PNC concerning the forged endorsements and forged signatures on the checks, as well as other elements of the fraud scheme and demanded that PNC repay

to Plaintiff the sum of money charged against his accounts in the payment of the numerous fraudulent checks.

43.     PNC refused to repay Plaintiffs or take any action to protect Plaintiffs' interest or otherwise make Plaintiffs whole for the substantial financial losses that Plaintiffs incurred.

44.     PNC will undoubtedly raise a claim that Plaintiff failed to timely notify PNC of the misappropriation of funds in the accounts at issue. Any such effort by PNC will be appropriately addressed in legal arguments, but it is important to note in this Complaint that *after* Defendant was on full notice of the scheme, it continued to honor fraudulent checks and other illegal transactions initiated by Ross against the accounts.

45.     The fact is that notice to PNC proved meaningless, and due to PNC's complete failure to address, correct, or prevent Ross's transactions, they continued unabated after specific notice had been provided.

46.     Indeed, *after* notice was provided to PNC Ross was able to obtain at least an additional $200,000 from various improper transactions in the accounts at issue here (including substantial unauthorized transactions and payment of a credit card from one of the accounts just days before her guilty plea).

47.     Plaintiff requested PNC to assist Plaintiff in curing the fraudulent and illegal scheme initiated by Ross. However, PNC has failed and refused to repay Plaintiff the sums charged against his accounts and has failed and refused to recredit his accounts.

48.     All of the accounts at issue here have signature cards matching to the accounts which were readily accessible to all PNC employees at all material times. The only signature on those cards was Plaintiff's.

10

49.     As noted herein, Plaintiff first discovered that there were issues in the accounts in April 2020 and immediately notified PNC. On April 28, 2020, PNC representative Donna Pearce notified Plaintiff that his report of fraudulent transactions had been forwarded to their Executive Client Relations Team, and that someone would follow up with him.

50.     On June 26, 2020, Plaintiff's law clerk, Lindsi Guyer, reviewed compensation checks to send to Plaintiff's law firm's account John Southy. While reviewing compensation checks, Guyer discovered that Ross had grossed over $19,000 in July of 2019. Guyer immediately notified Plaintiff, and Plaintiff terminated Ross' employment that same day

51.     On June 28, 2020, Plaintiff notified PNC Executive Client Relations Department, via an email to a PNC employee named Rachel M. (whose last name is unknown to counsel) that checks were being forged by Ross. Plaintiff provided PNC Ross' name, told PNC that Ross had been fired, and that the police had been contacted. Plaintiff instructed PNC to not permit Ross to transact any further business in relation to his accounts.

52.     Plaintiff was told by Rachel M. (whose last name is unknown to counsel) that someone from the PNC legal department would be in contact with him. Plaintiff was also told that PNC had enough information to get the PNC fraud team involved in the matter.

53.     After being put on notice of this fraud, PNC failed to take immediate action to stop Ross from accessing Plaintiff's accounts.

54.     PNC's failure to stop the fraudulent activity constitutes gross negligence, at the least. PNC's own Account Agreement for Business Accounts itself notes that PNC is  liable for its own gross negligence or willful misconduct.

55.     The incompetence of PNC agents, employees and servants demonstrates PNC's gross

negligence not only in specific connection to PNC's actions as to Plaintiff's accounts, but

also in PNC's hiring/retaining its employees.

56.     From May 1, 2020, to July 11, 2020, alone—a period after sufficient notice had been

provided to PNC, Ross transferred thousands of dollars out of Plaintiff's operating account.

Ross had transferred at least $1,000 a day for a period of nine days.

57.     Plaintiff did not receive any communications from PNC for almost a month after putting

PNC on notice.

58.     On July 13, 2020, Plaintiff emailed PNC representative Janet H. (whose last name is

unknown to counsel), informing her that it had been almost three weeks since he reported to

PNC that he had been a victim of Ross' embezzlement, but that he had heard nothing from

PNC's legal department. Plaintiff also asked Janet H. to please direct him to someone who

could examine the checks and credit his account.

59.     On August 3, 2020, PNC finally responded, but only to tell Plaintiff that to direct all

communications with PNC to Terri Hoover.

60.     Unable to get responsive information or relief from Defendant through his own actions,

on August 28 or 29, Plaintiff and an Agent from the United States Secret Service went to the

PNC Branch at 7th and I Streets, NW to investigate the fraud and inquire if the bank was

aware of it.  Plaintiff and the Agent spoke to PNC Manager Claudia (whose last name is

unknown to counsel) regarding the fraud.

61.     Even after all these efforts notifying Defendant about the fraud, Ross was able to

continue obtaining funds from Plaintiff's accounts.

62.     Several months after Plaintiff had informed PNC of the fraud, Defendant employee Terri Hoover informed Plaintiff that PNC had been paying monthly invoices for a Capital One Credit Card that did not belong to Plaintiff, for charges exceeding an amount of $8,000. Hoover informed Plaintiff that she had authorized reimbursement to Plaintiff's account. However, Defendant failed to provide Defendant with any explanation for how these transactions occurred, whether there were further unauthorized transactions, or how the transactions that were being reimbursed had been detected, while all the other unauthorized transactions had continued.

63.     Plaintiff then submitted a claim to PNC concerning his personal checking account ending in 9144. Operating at that point with incomplete information, he nonetheless notified PNC that 94 checks totaling $137,370.38 were presented for payment between August 25, 2016, to June 22, 2020, with forged maker's signature.

64.     This claim was independent of the losses as to the other accounts, and Plaintiff later corrected the claim with more accurate and greater detail on the losses.

65.     On March 07, 2021, PNC notified Plaintiff that this claim was being denied.

66.     On September 16, 2021, Plaintiff filed a Complaint with the Federal Deposit Insurance Corporation which was forwarded to the Office of the Comptroller of the Currency. This Complaint related to all three accounts at issue here. On September 29, 2021, PNC notified Plaintiff that all his claims remain denied.

67.     On December 14, 2021, Plaintiff filed an appeal of the denials with the Office of the Comptroller of the Currency. On December 29, 2021, PNC again informed Plaintiff that his claims remain denied.

68.     The lack of any affirmative action taken by PNC to protect Plaintiff after PNC was on actual notice of issues with the accounts exacerbated Plaintiff's losses.

69.     PNC Bank failed to exercise ordinary care in examining, evaluating, and applying due diligence to the investigation of the fraudulent checks. PNC's lack of due diligence and ordinary care significantly contributed to Plaintiff's losses resulting from the fraud scheme.

70.     PNC failed to follow their own internal operating policies and procedures, in addition to applicable industry standards, by paying or taking the fraudulent checks for deposit. PNC's internal policies require agents, servants, and employees to use ordinary care when examining checks presented for payment, and to refuse to honor a withdrawal if there is reasonable doubt as to who is authorized to make a withdrawal.

71.     As a proximate and direct result of PNC's conduct, Ross' illegal fraud scheme to defraud Plaintiff was successful and Plaintiff suffered the losses reflected herein.

72.     As required by the 1994 Money Laundering Suppression Act, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, and the Anti-Money Laundering Regulations contained in Title 31 of the Code of Federal Regulations, PNC had an obligation to enact policies and procedures with due diligence that would create a framework for compliance with  regulatory requirements, proper risk assessment, for identification of customers and identification and reporting to the federal government of questionable or unusual transactions occurring. At least some of the unauthorized transactions in Plaintiffs' accounts should have triggered such requirements, including notice of suspicious transactions, as some unauthorized transactions yielded more than $10,000 in cash. Disclosure of such suspicious transactions is mandatory through the use of Suspicious Activity Reports.

73.     By failing to apply reasonable safeguards to identify suspicious and fraudulent activity, PNC failed to meet its statutory and regulatory obligations, and enabled and facilitated Ross' bank fraud.

74.     The total amount that Ross stole through the fraudulent checks and other unauthorized transactions on the three accounts is over $725,000. In addition to the fraudulent checks, Ross also otherwise diverted funds from Plaintiffs' accounts to pay for her own personal expenses.

75.     The fact that PNC never questioned or refused to accept any of the fraudulent checks presented by Ross is evidence of incompetence by PNC and that PNC employees were inadequately trained and retained.

76.     A significant amount of money that PNC disbursed to Ross via the fraudulent checks came from Plaintiff's IOLTA account, without Plaintiff's authorization. In March 2020, a check on the trust account was not honored due to insufficient funds. In the District of Columbia, banks are required to notify the District of Columbia Disciplinary Board when a check written on a trust account is not honored. PNC notified the Disciplinary Board about this check, and as a result Plaintiff was subject to an investigation by the Disciplinary Board, which investigation eventually caused Plaintiff to surrender his license to practice law. Plaintiff has accrued over $18,000 in legal fees as a result, which he has been unable to pay.

77.     This inquiry from Bar Counsel triggered Plaintiff to make due inquiry into how the transactions could have occurred leading to the insufficient funds, and he notified PNC of the fact that there were unauthorized transactions in the IOLTA account by the end of April 2020.

## <u>COUNT I – LACK OF ORDINARY CARE AND GOOD FAITH</u>

78.    Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

79.    Pursuant to Uniform Commercial Code §§ 3-404 (D.C. Code § 28:3-404) and 3-405

(D.C. Code § 28:3-405), Defendant PNC had duties to exercise ordinary care and good faith

in the paying and taking of the fraudulent checks referenced herein. The breach of such

duties allowed numerous checks to be cashed and deposited without inquiry, which

substantially contributed to the Plaintiff's losses resulting from the fraud. PNC's failure to

exercise ordinary care allowed Ross to embezzle hundreds of thousands of dollars from

Plaintiff's accounts.

80.    However, Defendant's conduct here went beyond negligence and as noted above. PNC

acted recklessly, wantonly, and in willful disregard and conscious indifference for the rights

of others, and with knowledge of highly suspicious circumstances, amounting to a lack of

good faith, permitting Ross to engage in the fraud scheme for a period of years without

inquiry.

81.    PNC failed to inquire into the suspicious circumstances surrounding the checks

referenced herein, including, *inter alia,* permitting Ross to cash nine checks with a

description line of "compensation," even though the checks totaled more than $17,000, were

drawn from Plaintiff's law firm account and Plaintiff's personal accounts, were cashed three

to four days apart, and were cashed at multiple branches. PNC failed to exercise ordinary

care by not checking Plaintiff's signature card on file against any of the fraudulent checks,

which permitted Ross's forgery of Plaintiff's signature on checks to go unnoticed by PNC.

82.    PNC's failure to exercise ordinary care also permitted Ross to cash checks payable to

herself even though the description line read "Cash for [Plaintiff]."

16

83.     Additionally, PNC's failure to exercise ordinary care enabled Ross to steal funds from Plaintiff's Law Firm's Operating Account to a personal credit card account at another financial institution. Ross transferred approximately $7,264 from Plaintiff's Operating Account to her personal credit card, including transfers made after she had been terminated by Plaintiff and PNC had been made aware of this fraudulent scheme.

84.     In doing so, PNC failed to exercise ordinary care and good faith, and violated some of its most basic obligations and regulatory responsibilities, including under the Bank Secrecy Act (12 U.S.C. § 1951, et seq.).

85.     But for PNC's failure to exercise ordinary care and good faith, and conscious indifference to suspicious circumstances and basic obligations, this fraud scheme could have been prevented and Plaintiff's losses could have been avoided.

86.     As a result of PNC's failure to exercise ordinary care and good faith, Plaintiff has been damaged in the amount of at least $725,000 plus other damages suffered as a proximate consequence.

## COUNT II – UNLAWFUL TRADE PRACTICES

87.     Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

88.     It is a violation of D.C. Code § 28-3904 for any person to, *inter alia*,:

    a.  "represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have";

    b.  "represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another";

    c.  "misrepresent as to a material fact which has a tendency to mislead";

    d.   "pass off goods or services of those of another"; and/or

    e.   "represent that the subject of a transaction has been supplied in accordance with a previous representation when it had not."

89.    PNC repeatedly committed unlawful trade practices in violation of D.C. Code § 28-3904.

90.    PNC and its agents, servants, and employees repeatedly failed to practice due diligence and reasonable care and as a result, repeatedly honored fraudulent checks.

91.    PNC facilitated Ross' fraud scheme by honoring the fraudulent checks she wrote, even after PNC was put on notice by Plaintiff of the ongoing fraud.

92.    Each time PNC honored one of these fraudulent checks, the forged signatures were never compared to Plaintiff's signature card on file. By failing to look at Plaintiff's signature card, PNC passed off these checks as valid checks made out by Plaintiff when they were not.

93.    Additionally, through every fraudulent check that PNC did not question, investigate, or refuse to honor, PNC made representations that the fraudulent checks had the appropriate and required sponsorship and characteristics, while they actually did not. In honoring these fraudulent checks, PNC made material representations that these fraudulent checks met the particular standard and quality of a valid check. These representations are misleading as to the validity and legality of the checks.

94.    Each time that PNC and its agents, servants, and employees wrongfully honored a fraudulent check that had Plaintiff's forged signature, PNC and its agents, servants, and employees made a material representation that the check was properly payable. These representations are misleading as to the validity and legality of the checks.

95.    PNC owed Plaintiff a duty of ordinary care and good faith, which required PNC to act in compliance with Federal Banking Regulations and PNC's own policies and procedures.

96.     According to Plaintiff's Account Agreement with PNC, "the check must be properly completed and signed by the person(s) whose authority is on file with us."

97.     Each time that PNC and its agents, servants, and employees wrongfully honored a fraudulent check, PNC made representations that the transactions in question were in accordance with its previous representation that a check must be properly signed by the person whose authority is on file.

98.     Ross never had signature authority in Plaintiff's accounts. Plaintiff's signature card was the only signature card on file for his accounts.

99.     As a result of PNC's misrepresentations and unlawful trade practices, Plaintiff has been damaged in the amount of at least $725,000 plus other damages suffered as a proximate consequence.

## COUNT III – BREACH OF CONTRACT

100.    Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

101.    The Rules and Regulations for 1) the Account Agreement for Personal Checking, Savings and Money Market Accounts, and 2) the Account Agreement for Business Accounts, created contracts between Plaintiff and PNC. Under these contracts, PNC agreed to only honor checks that were signed by an authorized signer as listed on the signature card.

102.    Under these contracts, PNC agreed to rely on Plaintiff's signature card to verify the signature on a check.

103.    Despite these contractual obligations PNC, through its agents, servants, and employees, did not verify the signature on any of the fraudulent checks with Plaintiff's signature card that was on file for all of his accounts. By failing to verify the signature on the fraudulent

checks, PNC honored all of the fraudulent checks that contained a forgery of Plaintiff's signature as well as forged endorsements.

104.    PNC, through its agents, servants, and employees, breached its contracts with Plaintiff when it failed to verify the signature on these checks and honored all of the checks with forged signatures.

105.    PNC, through its agents, servants, and employees, further breached its contract with Plaintiff when it failed to credit Plaintiff's accounts for all of the funds lost due to this fraudulent check scheme.

106.    At all material times hereto Plaintiff was not a sporadic or casual banking customer of PNC. Plaintiff was an established banking customer and should have been valued by PNC.

107.    As a result of PNC's breach of contract, Plaintiff has been damaged in the amount of at least $725,000 plus other damages suffered as a proximate consequence.

## COUNT IV – NEGLIGENT HIRING AND/OR RETENTION OF EMPLOYEES

108.    Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

109.    At all material times hereto, PNC hired agents, servants, and employees to conduct proper and lawful banking transactions competently.

110.    PNC had a duty to use reasonable care to hire such agents, servants, and employees who were competent and fit to perform proper banking duties that are required to be given to the public, including Plaintiff.

111.    PNC had knowledge of its agents, servants, and employees who were otherwise incompetent and unable to protect Plaintiff from fraudulent activity.

112.    If PNC had practiced due diligence and reasonable care, it would not have ignored the

incompetence of its agents, servants, and employees who were unfit for their appropriate

duties.

113.    Plaintiff is able to identify Rachel M. (whose last name is unknown to counsel),

representative from the Executive Client Relations Team at PNC Bank, Janet Herrington,

Donna Pearce, Team Leader in PNC Bank's Retail Operations, Terri Hoover, PNC

Investigative Services Group Senior Associate, Daniel Tumolo, Assistant Vice President of

PNB Bank's Retail Operations, and other employees at PNC Bank. Each of these individuals

failed to take any action to attempt to stop the fraudulent transactions and also failed to credit

Plaintiff's accounts for the substantial losses that he incurred.

114.    Additionally, the other negligent PNC employees that also were incompetent include the

PNC tellers and other personnel that interacted with Ross, facilitated the fraudulent

transactions, and recorded the deposits. Plaintiff is not able to identify the names of these

individuals at this time, but it is expected that Plaintiff will be able to do so upon the

completion of discovery. Each of these individuals were careless, reckless, and failed to

follow any banking standards.

115.    Each of these employees were inadequately and negligently supervised and retained.

116.    Ross' fraud scheme is believed to have begun in 2016. Plaintiff is in the process

obtaining copies of all of the fraudulent checks that Ross forged from PNC. At this time,

Plaintiff has discovered that the fraud scheme includes hundreds of checks forged by Ross

since 2016, totaling at least $725,000. Ross was not authorized to sign Plaintiff's name on the

checks, nor was she authorized to endorse the checks in any form.

117. At no point prior to 2020 did PNC or its agents and employees question, refuse to accept for deposit, or refuse to accept for final payment any of the fraudulent checks.

118. Even when Ross cashed at least 8 checks with "compensation" in the description line within one month (October 2019), PNC honored each of these checks. No PNC employee ever questioned the fact that Ross was "compensated" by Plaintiff 8 times in one month. PNC employees failed to act with the reasonable care and competency that these suspicious activities required.

119. On multiple occasions Ross cashed checks with "compensation" in the description line from Plaintiff's IOLTA account. No PNC employee ever questioned the legality of allowing Ross to cash checks from an attorney's IOLTA account. PNC as a "DC Prime Partner," a bank that is approved as a depository by the D.C. Court of Appeals Board of Professional Responsibility to offer IOLTA accounts, failed to abide by the D.C. Bar Foundation's requirements to safeguard IOLTA accounts.

120. Ross cashed various checks at PNC in which she wrote "compensation" in the description line of the check. She also cashed checks payable to herself that included "cash for Bernard Grimm" in the description line. Ross was not entitled to any of these funds. Ross also caused money to be transferred from Plaintiff's IOLTA account at PNC to pay her personal credit card expenses at a different financial institution. She was not authorized to do so and was not entitled to use those funds for her personal expenses.

121. Even after Plaintiff gave PNC written notice of the fraud, on June 28, 2020, PNC did not take any action to stop Ross from continuing her fraudulent scheme.

122. From July 01, 2020, to July 11, 2020, Ross transferred at least $11,000 out of Plaintiff's operating account. Ross had transferred at least $1,000 a day for the next 9 days.

123.   Plaintiff did not receive any communications from PNC during this time.

124.   Even after PNC had notice that Ross was fired, and even after law enforcement had been in contact with PNC, Ross' fraud continued.

125.   Approximately 6 months after Plaintiff informed PNC of the fraud, Teri Hoover informed Plaintiff that PNC had been paying monthly invoices for a Capital One Credit Card, for charges exceeding an amount of $8,000. Plaintiff never authorized these transactions.

126.   The fact that Ross' fraud scheme operated without raising the suspicions of a single PNC employee for over 4 years is evidence of the incompetence of the PNC employees, and PNC's negligence in supervising and retaining these employees.

127.   Further, even after Plaintiff gave PNC notice of 1) the ongoing fraud, 2) the identify of Ross, and 3) the fact that Ross was fired, and 4) that law enforcement was involved, PNC permitted Ross to continue her fraudulent scheme.

128.   It is difficult to imagine a bank being more incompetent than knowing that is being used as an instrument in criminal fraud scheme and taking no action to stop it. Being aware of the fraud and allowing it to continue is evidence to the extreme that PNC's employees were inadequately trained, retained, and supervised by PNC.

129.   PNC's inadequate training and supervision of its employees allowed Ross to access Plaintiff's accounts whenever, wherever, and however she wanted, reflecting some form of inside assistance or, at the least, extreme recklessness by PNC and its employees.

130.   Despite PNC being on notice of the fraud and being required to investigate such matters, on information and belief, PNC's investigation (such as it was) did not even include interviews of the tellers at Plaintiff's main branch, where many of the fraudulent transactions occurred.

131.    PNC knew that hiring, retaining, and negligently supervising and training incompetent

employees would have a detrimental effect on its banking customers, including Plaintiff.

Such incompetence foreseeably created the circumstances that allowed Plaintiff to be

defrauded of hundreds of thousands of dollar. PNC owed a duty to Plaintiff to hire, retain,

and supervise competent employees. By failing to do so, PNC breached its duty to Plaintiff.

132.    PNC breached its duty to use reasonable care to hire, supervise, and retain agents,

servants, and employees who should have been competent to transact banking transactions.

133.    As a result of PNC's negligence in hiring, retaining, and supervising incompetent

employees, Plaintiff has been damaged in the amount of at least $725,000 plus other damages

suffered as a proximate consequence.

## COUNT V – ELECTRONIC FUND TRANSFER ACT VIOLATIONS

134.    Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

135.    This action arises out of Defendant's violations of the Electronic Fund Transfer Act, 15

U.S.C. 1693, et seq.

136.    Plaintiff is a consumer as defined by 15 U.S.C. 1693m(a) and is a person affected

by a violation of the Electronic Financial Transfer Act with standing to bring a claim

under 15 U.S.C. 1693m(a).

137.     Plaintiff never authorized PNC to pay invoices through online autopay, either in his

personal account or operating account. Nor did Plaintiff request a bank card from PNC,

utilize an ATM machine related to the subject accounts, request a debit card or request direct

deposit.

138.     In 2019, a teller at PNC suggested to Ross that it would be easier for her to cash PNC

checks if she had a PNC account. Acting on that suggestion, Ross opened a PNC account at a

24

Branch in her hometown of Leesburg, VA.

139.    Once that account was open, Ross obtained two credit cards and had the monthly

invoices for those cards auto paid out of Plaintiffs' accounts, thereby bringing the

transactions within the Electronic Transfers Act.

140.    Ross further obtained a debit card and a bankcard and removed money from Plaintiff's

accounts using automated teller machines (ATMs).

141.    Ross made online purchases and paid for those electronically out of Plaintiffs' PNC

Accounts.

142.    Ross made unauthorized online wire transfers of funds from Plaintiff's IOLTA Account

to Plaintiff's operating and personal accounts, in order to further facilitate her schemes,

which involved her removing those funds through cashing checks and making online

transfers.

143.     This conduct continued up to and through December 2021, revealing that Ross'

culpability was, if nothing else, outdone by Defendant's indifference and its own culpability.

144.    Plaintiff alerted PNC to the conduct that was occurring, but PNC failed to conduct the

timely investigation required under 15 U.S.C. § 1693f(a)(3), and when PNC finally did

respond to Plaintiff's request, it failed to provide relief and failed to stop the unauthorized

activity.

145.    As a result of PNC's violation of this statute, Plaintiff has suffered substantial economic

loss, including a loss of over $200,000.00 in online transfers alone. Plaintiff also has suffered

from anxiety, emotional distress, and the consequential loss of his bar license and all the

related income from the practice of law that he would otherwise been able to receive as a

direct result. He also lost the retirement funds stolen by Ross and used in the scheme, had his

credit score plummet to 320, preventing him from, among other things, getting a second mortgage on his home.

146.     Had PNC timely addressed and stopped the unauthorized transactions, Plaintiff could have credibly sought to defend himself against bar disciplinary charges, and he would not have lost his ability to earn a living.

147.     The Electronic Transfer Act requires that once a financial institution receives a notice of error from a consumer, it must conduct a reasonable investigation within ten days. 15 U.S.C. § 1693f(a)(3).

148.     Plaintiff is a consumer as defined by 15 U.S.C. 1693(a)(6) and 1693f(a).

149.     Unauthorized transfers such as the ones occurring here are the type of act that the statute seeks to prevent.

150.     PNC N.A. is a financial institution as contemplated by 15 U.S.C. 1693(a)(9)

151.     PNC violated section 1693(f) by failing to conduct a reasonable or timely investigation.

152.     In fact, PNC conducted no meaningful investigation after being advised of the unauthorized transactions, which included unauthorized electronic transactions covered by the Act. Instead, PNC allowed the unauthorized activity to continue, even after the early September 2020 meeting with the lead Secret Service Agent assigned to the case.

153.     The Act provides for civil liability for violations of 15 U.S.C. 1693(f), including treble damages if the financial institution acted knowingly and willfully.

154.     PNC's failures here, in regard to its investigation, the timing of its investigation, and its failure to stem the tide of unauthorized transactions meet the standard of knowing and willful conduct.

155.    As a result of PNC's violations, Plaintiff has been damaged in the amount of at least
$725,000 plus other damages suffered as a proximate consequence, and requests that an
award of actual damages under this count be awarded, trebled, and that appropriate additional
damages for emotional stress, lost wages, and other injuries be paid. Plaintiff also seeks
attorney's fees and any further relief that is deemed just and proper pursuant to this Count.

## COUNT VI – AIDING AND ABETTING FRAUD

156.    Plaintiff adopts and realleges the allegations set forth above as if fully set forth herein.

157.    Plaintiffs' office manager and bookkeeper embezzled hundreds of thousands of dollars
from Plaintiffs' bank accounts at issue here, through a fraudulent check scheme.

158.    Ross pled guilty to one count of bank fraud under 18 U.S.C. § 1344.

159.    Plaintiff first discovered that there were issues in his accounts in April 2020, and
immediately notified PNC.

160.    On April 28, 2020, PNC representative Donna Pearce notified Plaintiff that his report of
fraudulent transactions had been forwarded to their Executive Client Relations Team, and
that someone from the legal department would follow up with him.

161.    On June 26, 2020, Plaintiff discovered that it was Ross who was conducting the
fraudulent activity in his accounts. Plaintiff terminated Ross' employment that same day.

162.    On June 28, 2020, Plaintiff notified PNC Executive Client Relations Department, via an
email to a PNC employee named Rachel M. (whose last name is unknown to counsel) that
checks were being forged by Ross. Plaintiff provided PNC Ross' name, told PNC that Ross
had been fired, and that the police had been contacted. Plaintiff instructed PNC to not permit
Ross to transact any further business in relation to his accounts.

163.   Plaintiff was told by Rachel .M. (whose last name is unknown to counsel) that someone from the PNC legal department would be in contact with him. Plaintiff was also told that PNC had enough information to get the PNC fraud team involved in the matter.

164.   After being put on notice of this fraud, PNC failed to take immediate action to stop Ross from accessing Plaintiff's accounts.

165.   From May 1, 2020, to July 11, 2020, alone—a period after sufficient notice had been provided to PNC, Ross transferred thousands of dollars out of Plaintiff's operating account. Ross had transferred at least $11,000 a day for the next 9 days.

166.   *Months after* Plaintiff had informed PNC of the fraud, Defendant employee Terri Hoover informed Plaintiff that PNC had been paying monthly invoices for a Capital One Credit Card that did not belong to Plaintiff, for charges exceeding an amount of $8,000. Hoover informed Plaintiff that she had authorized reimbursement to Plaintiff's account. However, Defendant failed to provide Defendant with any explanation for how these transactions occurred, whether there were further unauthorized transactions, or how the transactions that were being reimbursed had been detected, while all the other unauthorized transaction had continued.

167.   Plaintiff submitted a claim to PNC concerning his personal checking account ending in 9144. He notified PNC that 94 checks totaling $137,370.38 were presented for payment between August 25, 2016 to June 22, 2020 with forged maker's signature.

168.   This claim was independent of the losses as to the other accounts, and Plaintiff later corrected the claim with more accurate and greater detail on the losses.

169.   PNC was fully aware of Ross' fraudulent check scheme, yet did not take any affirmative steps to prevent further fraudulent activity in Plaintiffs' accounts.

170.    In fact, PNC and its agents, servants, and employees continued to cash fraudulent checks presented by Ross *for months* after being put on notice by Plaintiff.

171.    PNC and its agents, servants, and employees provided knowing and substantial assistance to Ross while she conducted bank fraud.

172.    As a result of PNC aiding and abetting Ross' fraud, Plaintiff has been damaged in the amount of at least $725,000 plus other damages suffered as a proximate consequence.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor on all counts and order as follows:

A.  Compensatory and other forms of damages authorized by law, including punitive damages, in amounts to be proven at trial;

B.  Reasonable attorneys' fees and costs; and

C.  Such other legal and equitable relief as the Court deems just and proper.


Dated:  April 11, 2022                                Respectfully Submitted,


                                                    /s/ Barry Coburn
                                                    Barry Coburn
                                                    Coburn & Greenbaum, PLLC
                                                    1710 Rhode Island Avenue, N.W.
                                                    Second Floor
                                                    Washington, DC 20036
                                                    Phone: (202) 643-9472
                                                    Fax: (866) 561-9712
                                                    barry@coburngreenbaum.com
                                                    *Counsel to Bernard Grimm and The Law*
                                                    *Office of Bernard S Grimm*